IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 4, 2016

## ROBERT PAUL MICHAELS v. DEANNA SINGLETON DRINNON ET AL.

**Appeal from the Chancery Court for Hancock County**
**No. 14-9571      Douglas T. Jenkins, Chancellor**

---

**No. E2015-00009-COA-R3-CV Filed - July 15, 2016**

---

This is a property line dispute involving adjoining landowners. The plaintiff filed the instant action when the defendants began clearing land that the plaintiff asserted was his. The defendants filed a counter-complaint, claiming ownership of the disputed property. Following a bench trial, the trial court determined the location of a boundary line between the parties, thereby awarding to the plaintiff ownership of most of the disputed area. The defendants have appealed. Discerning no reversible error, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and KENNY W. ARMSTRONG, J., joined.

Scott A. Hodge, Morristown, Tennessee, for the appellants, Deanna Singleton Drinnon and Michael Drinnon.

David H. Stanifer and Neal W. Stanifer, Tazewell, Tennessee, for the appellee, Robert Paul Michaels.

**OPINION**

I. Factual and Procedural History

This boundary dispute action was filed by the plaintiff, Robert Paul Michaels, in the Hancock County Chancery Court on January 9, 2014. Mr. Michaels owns a parcel of unimproved real property located in Hancock County. Mr. Michaels asserted that

adjoining landowners, Michael Drinnon and Deanna Singleton Drinnon, had encroached upon his property and were excavating and clearing land belonging to him. Mr. Michaels requested that the court establish the proper boundary between the parties' respective properties. Mr. Michaels also sought a restraining order preventing the Drinnons from encroaching on his property and an award of damages.

The Drinnons filed an answer to Mr. Michaels's complaint, asserting that they owned the section of property in dispute ("Disputed Property"). The Drinnons stated that they had lived on their property for thirty-nine years and were familiar with the boundaries. According to the Drinnons, they were clearing a portion of their property for the purpose of placing a mobile home thereon for their daughter's use when the present dispute arose. The Drinnons asserted that they subsequently hired a licensed land surveyor, who determined that the Disputed Property belonged to them. The Drinnons filed a counter-complaint seeking establishment of the boundary line based on the survey and damages.

The trial court conducted a hearing on the merits on April 30, 2014. The first witness, Jim McMurry, testified that he was hired by Mr. Michaels's predecessors in title, the Yoders, to sell by auction approximately 276 acres of real property. In preparing for the auction, Mr. McMurry familiarized himself with the property's boundaries and believed he understood where they were located. Mr. McMurry conducted the real estate auction on May 1, 1993. As Mr. McMurry explained, the Yoders' property was sold in five tracts, with Mr. Michaels purchasing two of those tracts. He presented the court with a copy of the auction brochure, reflecting the general division and layout of the property being sold and containing a depiction of the Drinnons' property being excepted as "not part of sale." The brochure depicts the Drinnons' property as a rectangular parcel containing "1 Acre and 2 Mobile Homes" with frontage on Singleton Road. On the auction brochure, the Drinnons' property does not appear to adjoin the line of the property owner to the west, Mr. Manning. Instead, the property sold in the 1993 auction appears to surround the Drinnons' property on three sides, with the public road forming the boundary on the remaining side.

Mr. McMurry described the property purchased by Mr. Michaels as "wrapping all the way around" the Drinnons' property from Singleton Road. Mr. McMurry acknowledged that the auction brochure was based on the county tax assessment map and that no survey was performed at the time of the auction. According to Mr. McMurry, there existed a right of way traversing the Disputed Property from the public road to the property located behind the Drinnons' land purchased by Mr. Michaels.

Mr. Michaels testified that he attended the auction in 1993 and purchased the tracts of property that bounded the Drinnons' land on three sides. Mr. Michaels also

stated that he purchased the property for purposes of hunting and farming. According to Mr. Michaels, in October 2013 he observed workers on the Disputed Property, cutting trees and grading the land. Mr. Michaels reported that he attempted to speak with the Drinnons at that time but that Ms. Drinnon responded by calling the sheriff. He related that on January 1, 2014, he again saw machinery on the property being used for grading and tree removal. According to Mr. Michaels, these events led to his filing the instant action.

In support of his claim, Mr. Michaels explained that his warranty deed indicated a right of way across the Disputed Property, which he identified as a strip of land to the east of Mr. Manning's boundary line, running from Singleton Road to the rear boundary of the Drinnons' property. Mr. Michaels reported that the remains of an old road bed could be observed in that area. Although he had not had the property surveyed, Mr. Michaels indicated that he knew where the boundaries were located. No question had ever been raised concerning Mr. Michaels's ownership of the Disputed Property until the Drinnons began their alleged encroachment in 2013, twenty years after Mr. Michaels's purchase. Although the survey commissioned by the Drinnons indicated a poplar stump along Mr. Manning's eastern boundary, Mr. Michaels disputed that such a stump existed.

Barbara Seals testified that she had recently accompanied Mr. Michaels and his counsel on a visit to the Disputed Property for the purpose of searching for the poplar stump along Mr. Manning's eastern property line. Ms. Seals testified that they had been unable to locate any such stump or the remains of one. She also testified that they did locate the old road bed approximately forty feet from the fence on Mr. Manning's eastern boundary line.

Donnie Singleton, Ms. Drinnon's brother, testified that he met the surveyor, Mr. Lacey, at the property because Mr. Drinnon was unable to do so. Mr. Singleton reported that he had "been around" the property for years because the parcel, though previously titled to the Yoders, had been owned at one time by his father and uncle. According to Mr. Singleton, he showed the surveyor the corners of the Drinnons' property as he understood them to be. He testified that the Drinnons' property was bounded by Mr. Manning's property line to the west ("Manning Line"). Mr. Singleton also testified that although there were remnants of an old fence running across the rear of the Drinnons' property, he had never seen a poplar stump or the remains of one.

Mr. Drinnon testified that he had been living on the property since 1974 and became an owner in 1985. Mr. Drinnon stated that the old fence located along his rear property line was in existence when he moved in. He further explained that although the fence posts had rotted, the wire could still be seen lying on the ground. While Mr. Drinnon claimed that the fence continued to a poplar stump at the Manning Line on the

west boundary of his property, he acknowledged that there was a gap in the fence approximately ten to twelve feet from the Manning Line. In remembering the old road bed in that area, he claimed the road had been used by his wife's father and uncle to access their property behind his (now Mr. Michaels's property). When questioned, Mr. Drinnon described the road bed as ten to twelve feet in width.

In support of his competing claim, Mr. Drinnon maintained that his property extended to the Manning Line to the west. He also maintained that while an old poplar stump existed along the boundary, its location could only be determined by digging beneath ground surface leaves. Mr. Drinnon testified that he allowed a mobile home for his daughter to be placed on the Disputed Property, believing himself to be the owner. He admitted that while he attended the auction in 1993 and saw the auction brochure map, he did not understand the map and thus did not object at the time. Mr. Drinnon acknowledged that Mr. Michaels had a right of way over the Disputed Property not appearing in Mr. Drinnon's deed. Mr. Drinnon stated that although he did not show the poplar stump to the surveyor, he informed the surveyor of its location. Mr. Drinnon recognized that his deed description did not mention any correlation to the Manning Line.

Michael Lacey, a licensed surveyor, testified that he was retained by the Drinnons to survey their property. He stated that he reviewed the relevant deeds but noted that the descriptions were very vague. As Mr. Lacey explained, by virtue of the deed descriptions' vagueness, he asked Mr. Drinnon's daughter to have someone meet him at the property to identify the reference points. According to Mr. Lacey, Mr. Singleton and the Drinnons met him while Mr. Singleton identified a fence that had been built by Mr. Singleton and his father in the 1980s.

Mr. Lacey reported that he located the remains of the old fence stretching along the back line of the Drinnons' property. He further stated that while the fence contained a gap of approximately ten feet in width as it neared the Manning Line, there was evidence of an old road bed heading north at that point. As Mr. Lacey noted that the Drinnons' deed description called for a poplar tree, he explained that he found an old, rotten poplar stump along the Manning Line that lined up "pretty good" with the old fence running along the rear of the Drinnons' property. Mr. Lacey claimed that there were remains of a poplar tree there, which had fallen "northeasterly." He therefore determined the western boundary of the Drinnons' property to be the Manning Line, thus establishing the Drinnons' tract as containing 1.13 acres as Mr. Lacey surveyed it.

Upon further examination, Mr. Lacey acknowledged that the Drinnons' deed description did not mention the Manning Line. He also admitted that Mr. Manning's deed description expressly provided that Mr. Manning's property joined Mr. Michaels's property. Following his viewing of a photograph of the Manning Line taken by Mr.

4

Michaels's counsel, Mr. Lacey could not identify the poplar stump or a fallen tree. He did indicate that the right of way referenced in Mr. Michaels's deed was probably referring to the old road bed. When questioned by the trial judge regarding why the right of way was not reflected on his survey, Mr. Lacey responded:

> [B]ecause all three tracts on Michaels's property were all owned by the same owner, which being Carson Singleton. So they would have been found all under one ownership and so based on the Doctrine of Merger I believe it's called, once everything is under the same ownership there's no need for a right of way anymore.

Following the conclusion of the proof and closing arguments, the trial court rendered its ruling from the bench, stating in pertinent part:

> Well in the Court's analysis of the situation the first thing you do is read from Mr. Drinnon's Deed and Mr. Michaels's Deed. And unfortunately those Deeds are not very helpful. The only thing that the Court thinks from reading Mr. Drinnon's Deed is this language about leaving the road and going to the poplar tree would have to be on the western end of whatever tract of property he was deeded because otherwise it couldn't follow a generally southerly course back down to the road. It would be going generally northerly.
>
> So the first call in that Deed the Court thinks, leaving the public road that was then called [Chinquapin] and now called Singleton Road the Court's encountered that back in my days of practicing Law. And where exactly that point is is a dang good question. It's hard for the Court to determine that.
>
> There are no feet in that Deed. There's really no measurements. There's no steps. There's not even really good north, west, etc. directions in the Deed.
>
> So the Court would have to resort to the testimony of the Parties and the surveyor to try to ascertain where that point is. And one of the things that is very, very persuasive to the Court is the plat from that auction showed I think unequivocally that the Drinnon property did not go to the Manning line. Of course it was based on a tax map which is a very approximate document and tax maps can't really be used to set boundaries.

5

Then we've got the intervening problem of before anything was really settled one of us went up there and hauled off and dozed out a home site and started to set a home on it. And then this dispute ensued in court so I think that was getting the cart before the horse and the Defendants would have to bear the risk of loss of that.

The Court finds barely based on the evidence here before me, which is very scant, that the Parties should work with the surveyor and ascertain the western edge of the old road bed that went from Singleton Road up to the upper property line. And the Court believes that as nearly as can tell that was the intention of the Parties at the time. And that right of way likely is ten (10) feet in width. So the right of way itself would run parallel to Mr. Drinnon's eastern property line in a width of ten feet from Singleton Road to the upper property line. And the right of way is on the Drinnon side. That is, if you're standing in the road looking up the hill it would be on the right side.

Now as near as the Court can tell the footage on that is approximately forty (40) feet from the Manning line on the road and it sounds like its only ten (10) or fifteen (15) feet up at the . . . from the Manning line up at the upper side of the property.

Hopefully that will afford the Defendant[s] enough land to do what they want to with that house but if it doesn't, like I say the cart was before the horse and they ought to bear the loss on that.

The trial court subsequently entered a written order determining the boundary line for the Drinnons' property to be the western edge of the old road bed running from Singleton Road to the Drinnons' rear property line. Accordingly, the court determined that Mr. Michaels owned the property between Mr. Manning's eastern property line and the western edge of the old road bed. The Drinnons filed a motion to alter or amend, which the court denied by order dated November 26, 2014. In that order, the court explained in pertinent part:

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that the Motion to Alter and/or Amend the Judgment filed by the Defendants in this cause is hereby denied and of which the Court relies that the Defendants did not provide any additional proof other than what was previously provided at the trial in this cause and the Court specifically relies upon the previous findings of the Court.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the line between the parties shall begin at the stump located on Singleton Road and a straight line running to the corner of the Plaintiff and Defendant[s'] property, being 35 feet from the Manning line.

The Drinnons timely appealed.

## II. Issues Presented

The Drinnons present the following issues for our review, which we have restated slightly:

1. Whether the trial court erred by not accepting the boundary line determined by Mr. Lacey's survey.

2. Whether the trial court erred by relying on a tax assessment map in making its determination regarding the boundary line between the parties.

## III. Standard of Review

This Court reviews the factual findings of the trial court *de novo* with a presumption of correctness and will not overturn them unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Morrison v. Allen*, 338 S.W.3d 417, 425-26 (Tenn. 2011). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006). We review questions of law *de novo* with no presumption of correctness. *See Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000) (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)).

As this Court has previously explained regarding a boundary line dispute:

"In resolving a boundary line dispute, it is the role of the trier of fact to evaluate all the evidence and assess the credibility of the witnesses." *Mix v. Miller,* 27 S.W.3d 508, 514 (Tenn. Ct. App. 1999) (citing *Norman v. Hoyt,* 667 S.W.2d 88, 91 (Tenn. Ct. App. 1983)). The judgment of the trial court should be affirmed, absent errors of law, unless the preponderance of the evidence is against those findings. *Phillips v. Woods,* No. E2007-00697-COA-R3-CV, 2008 WL 836161 (Tenn. Ct. App. Mar. 31, 2008). Due to the fact-intensive nature of boundary line disputes, the trial court is best suited to assess the credibility of the witnesses and its credibility

7

determinations are binding on this court unless the evidence preponderates against them. *Id.* at *34. When the trial court makes a determination accepting one surveyor's findings over that of another, that same deference requires this court to accept the trial court's findings. *Id.*

The following rule has been adopted in Tennessee:

> The construction of deed and other instruments and documents and their legal effect as to boundaries is a question of law. What boundaries the grant or deed refers to is a question of law; where those boundaries are on the face of the earth is a question of fact. If, therefore, the evidence concerning the location of the true boundary line between adjacent landowners is conflicting, that issue is one of fact unless the legal construction of the deed or grant is such that the boundary is determined as a matter of law.

12 Am. Jur. 2d *Boundaries* § 121 (1997) (footnotes omitted). We therefore review the trial court's finding as to the true location of the [parties'] boundary line as a finding of fact that is entitled to the presumption of correctness. Tenn. R. App. P. 13(d). Thus, we will not disturb the trial court's judgment unless the evidence preponderates against it. *Id.*

*Hong v. Foust*, No. E2011-00138-COA-R3-CV, 2012 WL 388448 at *5 (Tenn. Ct. App. Feb. 8, 2012). *See also Conder v. Salyers*, 421 S.W.3d 589, 592 (Tenn. Ct. App. 2013).

## IV. Survey

The Drinnons insist that the trial court erred by failing to accept the common boundary line as shown on the survey performed by Mr. Lacey. The Drinnons essentially argue that a survey, submitted by a surveyor with accompanying testimony, should prevail when there is no competing survey. The Drinnons cite this Court's decision in *Johnson v. City of Mt. Pleasant*, 713 S.W.2d 659, 662 (Tenn. Ct. App. 1985), as authority in support of their argument. We determine *Johnson* to be unavailing in this action. In *Johnson*, this Court examined all of the evidence presented and determined that no material evidence existed to support the jury's verdict establishing the boundary line in question when the jury had found the line to be different from that determined by the surveyor and the surveyor's testimony was the only testimony locating the line. *Id.* In the case at bar, the trial court heard testimony from several witnesses regarding the location of the boundary line in question. The Drinnons contend, however, that because Mr. Lacey was the only expert surveyor to provide testimony, they should prevail.

We note that the precise argument advanced by the Drinnons herein was rejected by this Court in *Dowdell v. Cotham*, No. M2006-00750-COA-R3-CV, 2007 WL 2198169 at *8-9 (Tenn. Ct. App. July 25, 2007). This Court explained:

> [The plaintiff] argues the trial court erred when it disregarded the survey performed by a registered land surveyor in the absence of a competing survey and/or contradictory expert testimony. Citing to his argument relating to the summary judgment issue, [the plaintiff] . . . concludes the trial court should have determined at trial that the boundaries of the [plaintiff's] property were as stated on the survey performed by Burns.
>
> [The plaintiff] cites no authority to support his proposition that the law absolutely requires a competing land survey in every boundary line dispute or that the trial court must adopt the sole surveyor's findings as a matter of law. Similarly, he cites no authority to support his claim that the trial court was required to disregard the testimony presented by [the defendants] because the testimony was from lay witnesses rather than expert witnesses. This claim is simply without merit.

*Id.*

In the case at bar, Mr. Lacey's survey was contradicted by the testimony of Mr. McMurry and Mr. Michaels, both of whom stated that they were familiar with the boundaries of the Drinnons' property and that it did not adjoin the Manning Line. Although Mr. Drinnon and his brother-in-law, Mr. Singleton, claimed that the Drinnons' property did extend to the Manning Line, this assertion could not be harmonized with other evidence, such as the existence of the right of way, acknowledged by all witnesses to likely be the old road bed running north through the Disputed Property from Singleton Road parallel to the Manning Line. Significantly, this right of way is only referenced in Mr. Michaels's deed and not Mr. Drinnon's deed. If the Drinnons actually own the Disputed Property, the right of way should have been referenced in the Drinnons' deed as well. In other words, the only rational conclusion for the right of way's express reference in Mr. Michaels's deed is that it crosses his property. Ergo, the absence of any reference to the right of way in the Drinnons' deed indicates that they do not own the Disputed Property.

Additionally, Mr. Manning's deed description specifically references a beginning point on Chinquapin Road at the corner of Mr. Michaels's land. The deed description later describes following Mr. Michaels's property line south and southeast to the point of beginning. Mr. Manning's deed makes no reference to adjoining the Drinnon property.

9

Furthermore, Mr. Drinnon's deed contains no reference to a boundary with Mr. Manning or his predecessor in title.

Moreover, Mr. Lacey suggested in his testimony that he based his survey in large part on the information provided to him by the Drinnons and Mr. Singleton. In fact, Mr. Lacey stated that the deeds were "too vague" such that he needed someone familiar with the property to show him the reference points. Specifically, Mr. Drinnon's deed description states in total:

> BEGINNING at the main road on north side to the fence; thence south following fence to a poplar tree; thence back out the main road to the BEGINNING. Containing One (1) acre, more or less.

Both Mr. Drinnon and Mr. Singleton acknowledged that they provided Mr. Lacey with the location of the poplar tree on the Manning Line, although Mr. Singleton testified that he never actually observed the stump or its remains. As the trial court correctly noted, however, the language contained in Mr. Drinnon's deed description "about leaving the road and going to the poplar tree would have to be on the western end of whatever tract of property he was deeded because otherwise it couldn't follow a generally southerly course back down to the road. It would be going generally northerly." In other words, Mr. Drinnon's deed description would begin with the western boundary of the Drinnon property at the road, run north to the fence identified by the witnesses, and then continue in a somewhat southerly direction to a poplar tree. Mr. Lacey's survey, however, appears to begin on the eastern boundary of the Drinnon property at the road, run north to the fence, and then continue in a northerly direction to the purported poplar stump on the Manning Line. Thus, Mr. Lacey's survey does not appear to comport with the description in Mr. Drinnon's deed or any of the other deeds.

As this Court has previously established, when determining the location of a boundary line in dispute, the trial court should "look first to the natural objects or landmarks on the property, then to the artificial objects or landmarks on the property, then to the boundary lines of adjacent pieces of property, and finally to courses and distances contained in documents relevant to the disputed property." *Mix v. Miller*, 27 S.W.3d 508, 513 (Tenn. Ct. App. 1999) (citing *Franks v. Burks*, 688 S.W.2d 435, 438 (Tenn. Ct. App. 1984)). Therefore, when establishing a boundary, a "land owner may rely on deeds other than his or her own." *Mix*, 27 S.W.3d at 514. In this case, the trial court considered the testimony of all the witnesses and the totality of the evidence presented when concluding that the boundary formed by the old road bed was the most appropriate boundary between the parties' respective properties. Based on our thorough review of the record, we determine that the evidence does not preponderate against the

trial court's conclusion regarding the boundary line location or ownership of the Disputed Property. We therefore affirm the ruling of the trial court.

## V.  Reliance on Tax Map

The Drinnons also argue that the trial court erred in relying on the tax assessment map to establish the boundary of their property. The Drinnons posit that such tax maps are "not particularly helpful for the purpose of establishing a boundary line." *See Lafever v. Lafever*, No. M2008-00651-COA-R3-CV, 2009 WL 167329 at *9 (Tenn. Ct. App. Jan. 23, 2009); *see also Estate of Weaver v. Estate of Haley*, No. 03A01-9511-CH-00404, 1996 WL 97653 at *1 (Tenn. Ct. App. Mar. 6, 1996) ("[A] tax map from a tax assessor's plat does not establish a boundary line."). In this matter, the trial court noted in pertinent part:

> [O]ne of the things that is very, very persuasive to the Court is the plat from that auction showed I think unequivocally that the Drinnon property did not go to the Manning line. Of course it was based on a tax map which is a very approximate document and tax maps can't really be used to set boundaries.

Although the trial court noted that the auction plat was persuasive, it also discounted the plat's evidentiary value because it was based on a tax map. The court proceeded to determine that the proper boundary between the parties was the western edge of the old road bed "based on the evidence." Having determined that the evidence does not preponderate against the trial court's location of the boundary line, we affirm the judgment and find no error in the trial court's determination based on all the evidence presented.

## VI.  Conclusion

For the foregoing reasons, we affirm the trial court's judgment. Costs on appeal are assessed to the appellants, Deanna Singleton Drinnon and Michael Drinnon. This case is remanded to the trial court for collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE