IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 15, 2012 Session

## MARY JANE BRIDGEWATER v. ROBERT S. ADAMCZYK, ET AL.

**Direct Appeal from the Chancery Court for Smith County**
**No. 6776      Charles K. Smith, Chancellor**

_____

**No. M2012-00697-COA-R3-CV - Filed February 6, 2013**

_____

This appeal arises out of a boundary line dispute. On appeal, the landowners argue that the trial court erred in finding that the disputed property was owned by their adjoining landowner. The landowners further argue that the trial court erred in dismissing their third-party complaint against the individuals that sold them the property, and for refusing to award them an abatement in the purchase price based on the deficiency in acreage. After throughly reviewing the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

C. Tracey Parks, Lebanon, Tennessee, for the appellants, Robert S. Adamczyk and Tracy Adamczyk.

Betty Lou Taylor, Hartsville, Tennessee, for the appellee, Mary Jane Bridgewater.

James David Bass and James L. Bass, Carthage, Tennessee, for the appellees, James S. Green and Mike Gibbs.

**OPINION**

### I. Background and Procedural History

The following summary is taken from this Court's previous opinion issued in this case on April 1, 2010:

Mary Jane Bridgewater filed this action against her neighbors, Robert and Tracy Adamczyk, to "quiet title" to thirty acres of property claimed by each party. In her Complaint, Ms. Bridgewater asserts that she is seeking to "reclaim" the thirty acres of property, which has been "wrongfully claimed" by the Adamczyks. The Adamczyks filed an answer and a counter-complaint asserting that they are the true owners of the thirty acres in dispute. The Adamczyks also assert that this is an ejectment action, not an action to quiet title; thus, Ms. Bridgewater must demonstrate that she has both legal title and a right to immediate possession of the disputed property.

This dispute arose after the Adamczyks purchased a tract of land in Smith County from Mike Gibbs and Scotty Green in December of 1998 that adjoins property owned by Ms. Bridgewater. The December 7, 1998 warranty deed stated that Gibbs and Green conveyed approximately 115 acres to the Adamczyks. Gibbs and Green had acquired the property in March of 1998 from Jane Whitley. The March 28, 1998 warranty deed from Ms. Whitley stated that she was conveying approximately "86 acres" to Gibbs and Green. A Deed of Correction was filed by Ms. Whitley on May 22, 1998, to state that the acreage conveyed to Gibbs and Green was 115 acres, more or less.

Ms. Bridgewater claims to be the owner of two separate, adjoining tracts of land comprising approximately 155 acres. It is undisputed that Ms. Bridgewater owns a tract comprised of 130 acres, more or less, that derives from an 1876 deed to Ed Miller. What is disputed by the Adamczyks is Ms. Bridgewater's claim to a second and smaller tract of approximately 30 acres that derives from an 1884 deed to Ed Miller.

Ms. Bridgewater's claim to the property in dispute is based on her own Affidavit of Heirship, recorded in 2007, in which she states that she inherited the tract through several generations of intestate succession, a succession that derives from an 1884 deed. The last deed of record in Ms. Bridgewater's chain of title is a handwritten 1884 deed wherein T.J. Bradley and wife, Fannie Bradley, conveyed "35 acres, more or less," to Ed Miller in consideration of the cash payment of $537.50. There are no intervening deeds and no affidavits of heirship other than Ms. Bridgewater's 2007 Affidavit of Heirship.

In 2002, after the Adamczyks claimed ownership of the disputed 30 acres, Ms. Bridgewater filed this action. In the Complaint and in her Affidavit of Heirship, Ms. Bridgewater asserts that she inherited the property in dispute from her mother, Kate Lee Bowman Bridgewater, as her sole heir, who

inherited the property from her mother, Mattie Miller Bowman, as her sole heir, who inherited the property as the sole heir of her father, Ed Miller, who acquired the property by deed in 1884.

On July 29, 2002, the Adamczyks filed a counter-complaint asserting that they were the true owners of the property. . . . On November 19, 2004, the parties entered an agreed order granting the Adamczyks permission to file a third-party complaint against Mike Gibbs and Scotty Green. The Adamczyks filed the third-party complaint against Gibbs and Green for breach of the covenants, if Ms. Bridgewater was found to be the true owner of the property. Green and Gibbs filed an answer on February 8, 2005 denying any breach.

. . . .

On April 12, 2007, the trial court . . . granted Ms. Bridgewater's motion for summary judgment finding that there were no genuine issues of material fact and that Ms. Bridgewater was "the owner of the property in dispute in fee simple absolute because of the 1884 deed from Bradley to Miller who was [Ms. Bridgewater's] predecessor in title."

*Bridgewater v. Adamczyk*, No. M2009-01582-COA-R3-CV, 2010 WL 1293801, at *1-2 (Tenn. Ct. App. Apr. 1, 2010). The Adamczyks appealed. On appeal, this Court concluded that:

Ms. Bridgewater's Affidavit of Heirship fails to satisfy the requirements of Tenn. R. Civ. P. 56, thus it may not be considered in support of her motion for summary judgment and, with Ms. Bridgewater's Affidavit of Heirship removed from consideration, the record does not establish a factual basis for summary judgment. As there remain genuine issues of material fact regarding the ownership of the property at issue, we reverse the grant of summary judgment and the grant of possession to Ms. Bridgewater and remand this case to the trial court for further proceedings consistent with this opinion.

*Id.* at *6.

Subsequently, in February 2012, a bench trial was conducted in this matter over three consecutive days. After considering the testimony of two expert surveyors, multiple lay witnesses, and numerous exhibits, the trial court concluded that Ms. Bridgewater was the fee simple owner of the disputed property. Further, the trial court dismissed the Adamczyks' third-party complaint against Green and Gibbs. In support of its determination, the trial court

thoroughly explained its reasoning and made extensive findings which, in pertinent part, were as follows:

> [Ms. Bridgewater] filed a suit against [the Adamczyks] saying let's decide, you know, where the property line is, let the Court decide where this property line is because I own this, I've owned it all my life, and before my life my family has always owned it, and you've come in here and bought some property in 1998 claiming to own some of my property, 30.65 acres.
>
> Apparently, when the Adamczyks bought this property – they bought it in, I think, November maybe of '98, but the fall or winter of '98. The deed called for 115 acres more or less, and to not include this 30.65 acres only leaves them 92.44 acres, so these people have gone to war and been involved in a lawsuit here for about ten or twelve years.
>
> The Adamczyks here decided, well, we're going to sue the people that sold us the property under the warranty of the warranty deed saying they would warrant to us to defend whatever they conveyed to us against all claims, and they haven't defended it against us because they've let Bridgewater come in here and claim they own some of the property they conveyed to us so we want them to pay us something.
>
> So the plaintiff puts on their proof regarding this, and I'm going to go over the witnesses a little bit about the plaintiff's proof. First witness, Mary Jane Bridgewater herself. Her basic testimony was that we've always owned this property and our property is bounded on the east by this fence that runs along the gully or the branch, whatever it might be called, up to the head of the gully, then it runs in a northern direction up the gully, and then it runs in a northern direction over to a point so many feet. She didn't know the feet. She didn't testify to the feet. She just basically testified that was it.
>
> She testified the way she got in and out of this property was up – I think it was called Perkins Lane or Perkins Drive down here right out from her house. She lives on down Perkins Drive or Bowman Drive or whatever it might be called. She actually lives in a house that's south of the disputed area.
>
> Now, Mary Jane and other witnesses testified that they had sharecroppers to work some of this disputed area and property during her lifetime. . . . She also testified – and this was supported by Gibbs and Green, loggers – that they logged some of this property and paid her for the logs. She testified, and it

-4-

was supported by other testimony of other witnesses, that Francis Whitley, who was predecessor and owner – Francis Whitley died and his wife, Jane Whitley, sold this property to Gibbs and Green, and Gibbs and Green sells it to the Adamczyks, the tract over here – always cleared his land, and this over here, the portion in question was all grown up and wasn't in the nature of the land that Whitley would have had.

And also Miss Mary Jane testified until 1998, after the Adamczyks bought the property, there's never been an issue or a question about who owned that tract of land and where the property lines were. It's her testimony, like most people, I get a, I've always paid taxes on my property including this property. Every year they send me a statement and I pay the taxes.

She also testified that she and Jane Whitley entered into a written boundary line agreement showing where the property line was, representing that the far east property line was down that gully or up the gully to a point at the head of the gully and then off to the west, and it was later supported by Bill Cothern. He actually went out there and measured the measurements, and at his suggestion, an instrument got [sic] prepared. Exactly who prepared it, seems like nobody remembered, but it exists. It's been identified by the tax assessor, who says it's in his office, and by Bill Cothern, who says he notarized it.

And it identifies the property line right down the gully, right next to this gully or branch running down here at the – just running from a point down here close to a gate that come onto this property, that shuts – that sometimes is locked and shuts or divides this property right here, a gate, and it went over a few feet, measured up the creek line or the branch line or the gully line – whatever you want to call it, it's been called many different things – to a point, and then it goes over in a western direction and finally comes to another point. And all this is written out and signed by Jane Whitley and Mary Jane Bridgewater.

Now, there was a lot of questions about this agreement here when it got to Mrs. Whitley. Mrs. Whitley testified she and her husband never owned any of this disputed area. She thought – and when they talked to her about a deed of correction, she said, yeah, there was a deed of correction. She made it clear this deed of correction was meant to reduce the amount of property that we allegedly owned because we never owned this over here. We never owned it, never claimed to own it, and the tax map showed we owned it, and that's what we were doing, is trying to correct that.

Well, somebody messed up on this deed of correction, but they did get this agreement signed and filed showing that she didn't claim this, and the tax assessor, in 1998, entered this. In 1999 it reflected from there on that this property was no longer on the Adamczyks' property, Whitley, Perkins tract, it was property on the Bridgewater property.

Now, it's clear to me that Jane Whitley, when we talk a little bit about this deed of correction from Gibbs and Green to the Adamczyks and then there was a deed of correction, clearly Miss Jane thought it was correcting the problem I just mentioned. But, regardless, both of those deeds had in it that it was 115 acres more or less. Both of them were recorded, subject to be discovered on any type of title search, both public notice to the world, and the only difference in the two was a parenthesis, parenthesis closed. And the parenthesis basically stated, showing 86 acres by the tax assessor's map, parenthesis closed, something like that.

But it's still recorded. It hadn't been taken away from the public's view. It's still recorded. The deed of correction just merely didn't mention it in the second deed. It didn't say anything about it was wrong or nothing. It just merely didn't type it in. Really, it's evident to me that this was a mistake by somebody. Mrs. Whitley meant for them to take this absolutely off of her property, not show that it was there. That's the overwhelming evidence when you consider everything.

Now, Carroll Carman, I'll talk a little bit about him. He was hired by a title company . . . representing or insuring or whatever the Adamczyks. They said you go in there and you find who owns this disputed property. Carroll Carman goes in – and I'll tell you what, I found him to be very credible and an honest person. I found Mary Jane to be very credible and very honest.

He went in there and he talked to prior owners, including Mrs. Whitley; Lucy Oldham, whose mother and family had owned this property, who she had lived there – that is on this property, on the Perkins tract – the Whitleys, Lucy Oldham both told him we never owned this disputed property, it never was owned by our people, that's Miss Mary Jane's property.

He talked to people, other people, like Mary Jane, Gibbs, Green, Miller and other people that said this is – this property is Mary Jane's, it's always been. Then he does a very good title search, and I'll go into it more, and he finds all this property right here – he's got it all the way back basically to a land grant

to Thomas Banks, and then he shows where Banks conveys this property to Bradley, and I think that was deed book 1, [page] 771. And then Bradley comes along and sells this property – I think I'm right about that – but he sells this – I'll follow my notes on that to be accurate. I don't want to make an error just from my memory.

And he testified in his opinion he just found – he was unbiased. He could have gone either way. He didn't have a dog in the fight. He was of the opinion that his folks, his company, his people over here didn't own the property, and that this was owned, the disputed tract was owned by Ms. Bridgewater. If my memory is correct, when I was talking about the property over there, it's Matherson to Bradley; Bradley to Ed Miler by [deed book] 6, [page] 408; [Miller] to Perkins by deed book 6, [page] 41. That was the upper one-half, upper 50 acres of this land grant. I'll be more specific about that in a few minutes.

He testified in his opinion – and I agreed with him from the findings of everything I've studied and all the testimony I've heard – that the disputed tract is located and described in deed book 6, [page] 408. He took some overlays and put on an aerial map and found that when he took these overlays that represented [deed book] 6, [page] 408 and [deed book] 6, [page] 41, that they followed the contour of that gully and ditch almost precisely with very little variance.

Lucy Oldham, who as I stated who [sic] was a Hackett, granddaughter of Joseph and Mary Perkins, whose mother sold this property here to Jane Whitley's mother, this Perkins tract, she said she's familiar with this property, lived there for 20 years, walked it, played it, showed pictures of her being out there in the yard and so forth and knows where the property line is and knows that the disputed piece of property is owned by Mary Jane Bridgewater, been in her family forever, for as long as she can remember, as long as anybody can remember, and there was a fence on the west side of the branch. She drew a picture depicting everything there just about like this right here, very similar, and it's an exhibit in the testimony.

Bill Cothern, . . . testified in addition to all these other things, he worked on that Whitley farm some with Francis. But the way he testified, he says, I was contacted about maybe listing this property or something . . ., by Mrs. Whitley, and I drove out there to look at it. When I got out there, I was talking to a couple of hired hands that worked there, Bill Miller and Steve Kinney. I said,

why isn't that cleared off over there on the left, as he was pulling up there. That's the disputed area. Well, that's not part of this property. That's owned by Mary Jane Bridgewater.

That's when he got busy and said, look, the tax assessor's map shows differently, we've got to do something about this. So he gets Mary Jane and Jane Whitley to agree to sign an agreement. He goes out and gets in this ditch, with some help, measures off the boundary. They both agree to it, file it. Mary Jane thinks they're doing a deed of correction. It's just what she thinks. That's obvious from her testimony in her deposition. And there should have been a deed of correction done if that was necessary. Nobody thought it was necessary because the only real problem was the tax assessor's office was showing it being over here on the property owned by the Adamczyks.

Now, I understand the Adamczyks thought they were buying 115 acres. That deed says it. They ought to get what they bargained to get, but what we have to understand is in this part of the country and this state, "more or less," this deviation of 92.44 acres is not a great deviation from 115 acres. It's within the acceptable amount when you say more or less. It's not a gross inaccuracy. It's within more or less, and when you consider the fact that all these witnesses – plus Green and Gibbs say, look, we told her, we showed her where it was. We came in here and there were flags up and down this line right here up to the head of the gully, then there was a fence, remnants of a fence or a fence that ran in a western direction.

So, you know, it's their position and it's the finding of this Court that she got what she bargained for, that based upon everything, overwhelming everything here, it's obvious the testimony of the prior owners of both tracts, there's only one owner of the Bridgewater tract because it's been in their family since the land grant times. A search of the property, testimony of the land surveyor, Mr. Carman – now Mr. Vick did a survey, I'll have to say, but his problem was he couldn't put the pieces together. He never could – there's no way to put this south 50 acres below the north 50 acres.

And it was so clear in reading these, even though Miss Mary Jane, sure enough, testified there was a land grant from Colonel Miller, which was her great-great-great somebody, granddaddy somewhere down the line – sure enough, the testimony shows that one – the deeds and all refer to only one land grant, and this is the one to Thomas Banks. . . . And they had two children, one of them named Sophia Banks, who married Colonel Martin Miller. This

is where Colonel Martin Miller's land grant comes into existence. It did come about by land grant, but it was a land grant to Thomas Banks. That's the most logical, reasonable explanation of all of this. And, certainly, she – that's why I asked her if she had any records, anything other than just what she heard the family say. We're talking about back in 1826, is when this land grant, I guess, was filed or given or made or whatever.

 . . . . What I did last night, as I told you-all, I went home and couldn't sleep much, worked on this a little bit, took all the deeds that I had and the testimony I had heard and I wanted to come up to some type of understanding about these properties. So as I stated, we had – what I found was, is that on 11/21/1826 there was a land grant to Thomas Banks, who is the father of Sophia Banks, who married Colonel Martin Miller.

And then I found the Matherson deed that's filed in deed book 1, [page] 771, him and his wife, Elizabeth, conveyed to T.J. Bradley the upper one-half of 50 acres, northern one-half of a 100-acre grant. . . . It says that it's bounded on the east by Perkins and Davis, and north by Perkins, south by the other one-half of said grant. It's just clear that it would be 50 acres and 50 acres under it. This is further verified by – after Bradley owned this property – all right. That deed, Bradley, was deed book 1, page 771, dated 11/9/1872.

Now, in deed book 5, page 33 there was a deed from Nancy Miller to Ed Miller of the remaining 50 acres, the southern portion of the Banks 100-acre land grant. That's Exhibit Number 24. It notes it's bounded on the north by the entire southern boundary of the northern one-half of that sold to Bradley. Note also that this conveyance was eight years before the Perkinses acquired the 19 acres of the upper 50 acres located on the east side of the branch.

3/6/84 there were two conveyances made of this upper 50 acres. It was divided by T.J. Bradley. He sold 35 acres on the west side of this property to Ed Miller, who is Mary Jane Bridgewater's great-grandfather. And also the same man that had bought the southern 50 acres is also Mary Jane Bridgewater's great-grandfather, who she ultimately inherited this property from them by – not by deeds and not by wills, just by inheritance, no one left. There was no – she ultimately ended up the one inheriting them as of today.

In addition to 50 acres on the west side that was deed book 6, page 408 – and this was consistent with Mr. Carman – that's the area in dispute. The other 15 acres was conveyed by Bradley to William Perkins, and it's on the same date,

and it said it contained 19 acres more or less. But before these were conveyed, the deed down here from Nancy Miller to Ed Miller pointed out that the upper northeast corner of her property came to the southeast corner of the Bradley property, and also the upper northwest corner of the Miller property came to the southwest corner of the Bradley property. It would be just too much coincidence for there to be two land grants where the upper 50 acres was conveyed to the Bradleys and I find that very difficult to believe. The most consistent, reasonable theory of all of this based upon the deeds, based upon all the testimony of all the witnesses, is that this property, the disputed area is owned by the Bridgewaters.

See, as I pointed out in talking here – and Mr. Vick agreed – that according to this, this lower 50 acres is just right to the south side. According to the Matherson deed, according to the Miller deed, according to all these deeds, it had to be right south of it, south of the first 50 acres. And for him to put the property where he said he was putting it . . . he couldn't put – he said the south 50 acres wouldn't fit south of that tract he put in. It wouldn't do it. He'd have to put it over here on the west side.

Well, that is inconsistent with everything. He said you would have to put it over here on the west side. Well, all these instruments call – the Matherson deed, you know, and all of them talk about the Matherson, the upper one-half, 50 acres more or less is T.J. Bradley. And the upper half means there's a lower half, and it refers to the northern, the northern or upper side. So that's just – it was – he said that even if you put it where he wanted to put it, if it would fit there, it would overlap with other property that was there. So he just could not get it to a consistency, where Mr. Carman took his overlays, read these [deed book 6 page] 408, [page] 41 and said they fit almost perfectly on here.

So I find that he's correct. I find that Ms. Bridgewater owns that property based on all the statements I've made. And Mrs. Adamczyk, the only person that testified she owned the property was her. I just can't believe that all these other people were lying or coming in here – even the prior owners, they all seemed to be very credible, Mrs. Oldham, Mr. Cothern, all of them. I didn't – well, maybe Mr. Miller saying she told him what can I do, maybe that's not right, but I don't know. You know, I didn't – it wasn't enough to scratch him from the whole thing, for me to change my opinion about this, nor was the fact that Ms. Bridgewater testified that Colonel Miller actually got this in a grant. It's just too consistent that he did get it. It was a grant but it was Thomas

Banks' grant. He married Thomas Banks' daughter, Sophia. All that is pretty consistent to me.

And, like I said, I dismiss the case against Gibbs and Green, and my memory could be shaken, but one reason I don't – I think she got what she bargained for by all the proof, all the statements, all the statements I've said the witnesses testified. She got what she bargained for. They warranted the title that they sold her – they particularly told her she didn't own this.

On March 7, 2012, the trial court entered a final order adopting its findings made at the conclusion of the trial. Thereafter, the Adamczyks timely filed a notice of appeal to this Court.

## II.  Issues Presented

The Adamczyks present the following issues, as restated, for our review:

(1)     Whether the trial court erred in finding that Ms. Bridgewater was the rightful owner of the disputed property when she did not prove full deraignment of title, and

(2)     Whether the trial court erred in dismissing the Adamczyks' third-party complaint against Gibbs and Green, and by not awarding an abatement in the purchase price based on the deficiency proven.

## III.  Discussion

We begin our discussion by addressing a question left unanswered by the parties and the trial court in the proceedings below. In this Court's previous opinion in this matter, we noted that:

The Adamczyks have also asserted that the civil action asserted by Ms. Bridgewater is not an action to quiet title, but rather an action of ejectment that carries with it a different legal standard. In her Complaint, Ms. Bridgewater asserted that she is seeking to "reclaim" the thirty acres of property, which has been "wrongfully claimed" by the Adamczyks. If this is an action of ejectment, not an action to quiet title, Ms. Bridgewater must demonstrate that she has both legal title and a right to immediate possession of the disputed property. *See Johnson v. Mt. Pleasant*, 713 S.W.2d 659, 661 (Tenn. Ct. App. 1985) (citing *Brier Hill Collieries v. Gernt*, 131 Tenn. 542, 175 S.W. 560

(Tenn. 1914); *Bertha v. Smith*, 26 Tenn. App. 619, 175 S.W.2d 41 (Tenn. Ct. App. 1943)). As the parties did not fully brief this issue on appeal, and we have elected to remand the case to the trial court, we choose not to determine whether this is an action to quiet title or an ejectment action, and leave that for the trial court to determine on remand after the parties have been afforded the opportunity to fully brief the issue.

*Bridgewater v. Adamczyk*, No. M2009-01582-COA-R3-CV, 2010 WL 1293801, at *6 (Tenn. Ct. App. Apr. 1, 2010). It is clear from the record, however, that this issue was not addressed on remand. After reviewing the pleadings, arguments, and the trial court's extensive findings, we are of the opinion that this case involves a simple boundary line dispute and an action to quiet title to the disputed land. Therefore, because this is not an ejectment action, Ms. Bridgewater was not required to prove a complete deraignment of title from the state or a common source.[1] *See Burks v. Boles*, 934 S.W.2d 653, 654-55 (Tenn. Ct. App. 1996). Instead, pursuant to Tennessee Code Annotated section 16-11-106(b),[2] Ms. Bridgewater had the burden to prove clearly that she is the true owner of the property described in the complaint. *Id.*

As we explained in *Dillehay v. Gibbs*, No. M2010-01750-COA-R3CV, 2011 WL 2448253 (Tenn. Ct. App. June 16, 2011):

> The usual standard of review applicable to bench trials applies in boundary disputes. *Jackson v. Bownas*, No. E2004–01893–COA–R3–CV, 2005 WL 1457752, at *6 (Tenn. Ct. App. June 21, 2005). This Court conducts a *de novo* review of the trial court's decision with a presumption of correctness as to the trial court's findings of fact, unless the evidence preponderates against those findings. *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006). For

---

[1] To succeed in an ejectment action, the plaintiff must establish that she has both legal title and a right to immediate possession. *Johnson v. City of Mt. Pleasant*, 713 S.W.2d 659, 661-62 (Tenn. Ct. App. 1985) (citations omitted). The burden of proof is upon the complainant to prove that she has a perfect title to recover even against the defendant who has no title or who is a trespasser. *Id.* (citations omitted). "The complainant in an ejectment suit must establish title by deraigning title to a common source under which both parties claim or by seven years adverse possession under a registered color of title or by 20 years actual adverse possession." *Id.* (citations omitted).

[2] Tennessee Code Annotated section 16-11-106(b) provides that:

In all such cases a complete deraignment of title by the complainant from a state grant or common source of title shall not be required as in ejectment cases, but it shall be sufficient to establish title in the complainant where the complainant proves clearly that the complainant is the true owner of the lands described in the complainant's bill.

the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999).

"In resolving a boundary line dispute, it is the role of the trier of fact to evaluate all the evidence and assess the credibility of the witnesses." *Mix v. Miller*, 27 S.W.3d 508, 514 (Tenn. Ct. App. 1999) (citing *Norman v. Hoyt*, 667 S.W.2d 88, 91 (Tenn. Ct. App. 1983)). "Where there is a conflict in testimony, the trial court is in a better position than this Court to observe the demeanor of the witnesses and evaluate their credibility." *Jackson*, 2005 WL 1457752, at *6. Thus, we will give great weight to a trial court's determinations as to the credibility of witnesses. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). This deferential standard specifically applies in a boundary dispute where a trial court must choose between two competing surveys. *Jackson*, 2005 WL 1457752, at *6 (citing *Mix*, 27 S.W.3d at 514; *Stovall v. Bagsby*, No. M2002–01901–COA–R3–CV, 2003 WL 22768677, at *2 (Tenn. Ct. App. Nov.24, 2003); *Edwards v. Heckmann*, No. E2002–02292–COA–R3–CV, 2003 WL 21486987, at *4–5 (Tenn. Ct. App. June 25, 2003)).

"When determining a boundary line that is in dispute, the court must look first to the natural objects or landmarks on the property, then to the artificial objects or landmarks on the property, then to the boundary lines of adjacent pieces of property, and finally to courses and distances contained in documents relevant to the disputed property." *Mix*, 27 S.W.3d at 513 (citing *Franks v. Burks*, 688 S.W.2d 435, 438 (Tenn. Ct. App. 1984); *Thornburg v. Chase*, 606 S.W.2d 672, 675 (Tenn. Ct. App. 1980)).

*Id.* at *6.

After reviewing the record, we are unable to conclude that the evidence preponderates against the trial court's finding that Ms. Bridgewater owned the disputed property. The trial court's determination relied in part on which of the two competing surveys it found to be the most reliable– Mr. Carman's survey or Mr. Vick's survey. From our review of the record, we find that the trial court thoroughly considered each of the surveyors' methods and conclusions. Specifically, the trial court analyzed each of the surveyors' opinions regarding the relationship between the multiple deeds presented by the parties, many of which arose in the 1800s and contained ancient descriptions. Mr. Carman was the only surveyor to give

an opinion, within a reasonable degree of surveying certainty, that established a boundary line in a manner consistent with all of the deeds and exhibits presented. Moreover, except for Mr. Vick and Mrs. Adamczyk, Mr. Carman's opinion was corroborated by each of the remaining witnesses' testimonies. Therefore, we conclude that Ms. Bridgewater met and exceeded her burden under Tennessee Code Annotated section 16-11-106(b) to prove clearly that she was the owner of the disputed property. In light of the great deference this Court gives to a trial court's decision between competing surveys, we find no error in the trial court's finding that Ms. Bridgewater owned the disputed property.

Finally, we must address whether the trial court erred in dismissing the Adamczyks' third-party complaint against Gibbs and Green, and by not awarding an abatement in the purchase price based on the deficiency proven. As the Adamczyks concede in their brief, "[i]t is clear from the parties' contract and the testimony that the sale was 'in gross.'" Generally, "where a sale is 'in gross,' and not by the acre, compensation will not be granted for either an excess or a deficiency in the acreage." *Vaughn v. Ray*, 598 S.W.2d 772, 774 (Tenn. 1980) (citing *Evins v. Price*, 63 Tenn. App. 627, 477 S.W.2d 204 (1972); 92 C.J.S. Vendor and Purchaser s 266(3) (1955); Annot., 1 A.L.R.2d 9 (1948)). This general rule, however, is subject to exceptions. On appeal, the Adamczyks urge this Court to consider the following exception:

> If the deed recite [sic] the number of acres, and it subsequently turn out upon survey, or be otherwise accurately ascertained, that there is an excess or deficiency, over or under the acreage stated, so great as to justify an inference of fraud, or of a mistake equivalent in its effect to fraud, relief will be granted.

*Rich v. Scales*, 116 Tenn. 57, 91 S.W. 50, 51-52 (1905). The Adamczyks argue that the twenty percent (20%) variance in acreage– the property surveyed out at 92.44 acres, as opposed to 115 acres "more or less" stated in the deed– raises an inference of fraud or mistake equivalent to fraud. We disagree.

From our review of the record, we find no reason to stray from the general rule in this matter. As the Adamczyks stipulated at trial, despite the insistence of their attorney, they did not have a survey of the property conducted before closing. Moreover, Gibbs and Green testified that they never owned and never intended to sell the disputed property owned by Ms. Bridgewater.[3] Gibbs further stated that he discussed with Mrs. Adamczyk about the location of the boundary lines on the property she was purchasing, and that his description to her did not include the disputed property owned by Ms. Bridgewater. Accordingly, we agree with

---

[3] Although Green did not testify at trial, the parties stipulated that his testimony would be the same as Gibbs.

the trial court's finding that the Adamczyks got what they bargained for, and probably could have avoided litigation altogether had they surveyed the property before closing. Under these circumstances, given the lack of evidence of fraud or misrepresentation by Gibbs and Green, and the inattention of the Adamczyks, we find no error in the trial court's judgment.

## IV. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court. Costs of this appeal are taxed to the appellants, Robert S. Adamczyk and Tracy Adamczyk, and their surety, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE